# Appeal of Hall et al.

1. A testator in his will directed his executors "to inclose with a good and substantial iron fence the Friends' Meeting-house grounds, as also the school-house grounds and the Friends' burial ground." These three grounds were adjoining, *held*, that under the circumstances, there was no latent ambiguity as to the testator's intentions to inclose each of said grounds on all sides.

2. Equity has jurisdiction to establish a right under a will and to compel the performance by the executors of their duties incident to that right, under said will.

3. The adjudication of the Orphans' Court of a matter, wherein the executors are accountants and the legatees under the will are exceptants, does not estop a beneficiary from proceeding in equity to establish his rights and to compel their performance.

February 9th, 1886. Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.

APPEAL from the Court of Common Pleas of *Chester county* in equity: Of January Term, 1885, No. 365.

This was an appeal by Hiram Hall and others, a committee appointed by Kennett Square preparatory meeting of Friends, from the decree of the court dismissing their bill.

The bill and answer were referred to R. Jones Monaghan, Esq., whose findings of facts and conclusions of law were substantially as follows:

The facts, as I understand the contention, are these: By deed dated June 14th, 1813, Robert Lamborn and wife, "in consideration of the yearly payment of one grain of wheat when lawfully demanded by the said Robert Lamborn or his

heirs," granted, bargained, sold and confirmed, with a covenant for further assurances, to William Chambers and others, "and to the survivor or survivors of them, and the assigns of such survivor or survivors forever," a tract of three acres of land in the then village, now borough, of Kennett Square, "excepting the privilege of a road twenty feet wide adjoining John Taylor's line along the west side of the above described tract, for the said Robert Lamborn, his heirs and assigns, to pass and re-pass at all times."

There is no trust, expressed on the face of the deed, in the grantees therein named, but I am given to understand that they were a committee of a meeting of the Society of Friends, and that this is the usual method in that religious body for the holding of titles to real estate used for the purposes of their Society. This tract has ever since been used as a meeting-house ground, and there are erected thereon the usual buildings and improvements. It is fair to assume, too, though nothing on the subject appears in the evidence, that the burial ground is on the same lot.

Samuel Martin, the respondents' testator, was an active member of the Kennett Square Meeting of Friends. He was a regular attendant of the meetings of that Society, and an approved minister therein. He died June 17th, 1880, at an advanced age, possessed of an estate estimated to exceed $70,000, and leaving to survive him only collateral heirs. By his last will, dated March 15th, 1878, he devised a lot adjoining the meeting-house grounds, on which he had erected an academy building, together with a considerable sum of money, to the Kennett Monthly Meeting of Friends, for the maintenance of an academy or school, known as the Martin Academy.

The three lots, the meeting-house grounds, the Martin Academy property and the burial grounds, adjoin, as appears by the draft returned herewith, the meeting-house grounds and the school lot fronting on what is known as State street, and the cemetery lot lying partially in the rear of both the other lots.

By a codicil to his will, bearing date March 8th, 1880, Samuel Martin directed as follows: "I, Samuel Martin, of Kennett Square borough, have for a considerable time desired, and it is my wish, that my executors named in my last will and testament, shall at a proper time within one year after my death, inclose with a good and substantial iron fence (somewhat like the one around the cemetery at Unionville), the Friends' Meeting-house grounds, as also the school-house grounds attached, and the Friends' burial ground, all expenses incurred to be paid from the proceeds of my estate."

Samuel Martin had some time before his death commenced

the erection of this iron fence, and it was in process of construction at the time of his death. Sharpless Mercer, one of his executors, then acting under a letter of attorney, had erected or contracted for the erection of so much of the fence as extended along State street, in front of both the meeting-house and school-house lots. The bill therefor of $444.60 was allowed, after exceptions, in the distribution of Samuel Martin's estate.

The settlement of that estate seems to have been closely scrutinized by the residuary legatees, who appear to have endeavored to keep all expenditures within as narrow bounds as was properly possible.

A question seems to have early arisen about the matters contained in this codicil (1), as to the bill for fencing already incurred (2), as to whether each of the three lots should be fenced separately, or a common fence around the whole as one, and (3) as to the amount of money necessary to be expended in building the fence. The executors endeavored to agree with the residuary legatees as to the amount needed. Failing in that they filed their first account on July 7th, 1881, in which they claimed credit for the $444.60, the bill already incurred, and for $1,600 reserved wherewith to finish the fence. Exception was taken by the residuary legatees to these credits, among others, and on August 8th, 1881, the Orphans' Court appointed Geo. M. Rupert, Esq., Auditor, to consider and report upon said exceptions. The Auditor met on September 21st, September 28th and October 7th, 1881, and on November 21st, 1881, filed his report, which, after exception, was confirmed absolutely by the court, on January 3d, 1882. By his report, the Auditor approved the credit of $444.60, for fence already built, and allowed for a division of fence between the three lots, but reported that the remainder of the fence could be built for $1,350, and reduced the credit of $1,500 to that amount.

The first account of the executors, to which these exceptions were filed, showed a balance remaining in their hands of $31,306.29. On January 3d, 1882, Mr. Rupert was appointed by the Orphans' Court, Auditor, to make distribution of this balance, as corrected and ascertained by the confirmation of his report on the exceptions, and on March 15th, 1882, his report, distributing this balance among the legatees, a considerable amount being distributed *pro rata* amongst the residuary legatees, was absolutely confirmed by the court.

On June 29th, 1882, the executors filed a supplemental account, which showed a balance in their hands of $348.60. This balance was by them distributed among the residuary legatees without a decree of distribution by the Orphans'

Court, or an Auditor, and a refunding bond was taken by the executors from the legatees.   This bond was not submitted to the Orphans' Court for approval, but was a matter of private agreement between the executors and residuary legatees.    It refers only to the balance of $348.60 appearing by the supplemental account, and does not relate to the balance shown by the first account, which was distributed by the decree of the Orphans' Court.

It appears that the control of the meeting-house grounds and the cemetery is vested in what is called the Kennett Square Preparative Meeting of Friends, and the control of the school property adjoining is in the Kennett Monthly Meeting. Both of these bodies are unincorporated associations for religious worship.   The Preparative Meeting is identical with the Kennett Square Meeting of Friends, which meets at this meeting-house twice a week for worship.   The Kennett Monthly Meeting is a superior ecclesiastical organization, composed of three preparative meetings, the Kennett Square Preparative Meeting, the Kennett Preparative Meeting and the Marlborough Preparative Meeting.   It meets alternately at the local meeting-houses of the subordinate bodies.

The Monthly Meeting had the title to the school property, and had received, under Samuel Martin's will, certain other bequests toward maintaining said school.

The codicil to Samuel Martin's will, which is involved in this contention, was not probated by the executors at the time of proving the will, but was admitted to probate after a citation issued at the complaint of Evan T. Swayne, one of the plaintiffs here.   On August 3d, 1880, the Monthly Meeting appointed a committee of fourteen "as trustees to have charge of the property and fund donated by the late Samuel Martin, to Kennett Monthly Meeting of Friends, and to assume such other responsibilities incurred thereby, as designated in his will."    That committee employed Washington Townsend, Esq., to represent them.   The first question about which Mr. Townsend was consulted was in regard to some bank stock which Samuel Martin had bequeathed to the Monthly Meeting, but afterwards, before his death, had disposed of.   Later, the codicil was presented to him for his opinion, and by him procured to be admitted to probate.   When the exceptions were filed to the executors' account, Mr. Townsend appeared before the Auditor as counsel for the Kennett Monthly Meeting.   He looked after, however, all matters which arose before the Auditor in regard to the codicil, and that were involved in the erection of the iron fence.   Although employed and paid by the Monthly Meeting, and although technically representing no one else, neither he nor any of the parties in interest

understood at the time that there was any distinction between the Preparative Meeting and the Monthly Meeting in the matters involved before the Auditor. At the same time it is clear that the committee of the Preparative Meeting did not officially employ Mr. Townsend, nor did they officially undertake any part of the proceedings before Mr. Rupert.

The committee of the Preparative Meeting was appointed July 29th, 1880. It consisted of Hiram Hall, John Lamborn, Samuel Chandler and Evan T. Swayne, the four plaintiffs in this bill. Mr. Swayne is also a member of the Monthly Meeting committee, and was one of its number who corresponded and consulted with Mr. Townsend. The duty of the committee, as appears by the minute of its appointment, was " to inquire into the interest of this meeting relative to Samuel Martin's bequest pertaining to an iron fence inclosing our grounds ; to see that such fence be erected in a suitable manner; to erect good and substantial granite posts at the gateway, and to perform such other duties as may be incumbent thereto."

The matters contested before Mr. Rupert in regard to this fence, were three : 1st, the propriety of allowing the credit for $440.60, the bill incurred before Mr. Martin's death; and 2d, whether a proper construction of the will required a division fence between the three lots, as well as the outside fence; and 3d, whether that fence could be erected for a less sum than the $1,600 reserved for that purpose. It appears by the evidence before me that on the western side of the meeting-house lot are erected certain frame sheds, which stand on a stone foundation, and are used by the horses and vehicles of those who attend the meeting. These sheds extend almost the entire length of the western side of the lot, being within thirteen feet of the southern line, and within twenty-six feet of the northern, or State street, line. They are not located on the western line of the lot, as described in the deed from Robert Lamborn, but are twenty-seven feet east thereof, at the northern end, and about forty feet to the east at the southern end. There is nothing on the ground at present to indicate to the casual observer that this strip of land west of the sheds belongs to the meeting-house lot. It lies in the rear of an adjoining lot of Henry G. White, and is used by him with his own lot for storing lumber and rubbish. At the same time it is clear that Samuel Martin, in his life-time, knew where the boundary line was. This strip, however, is subject to the privilege of a road twenty feet wide reserved in the deed of Robert Lamborn. The dominant property entitled to the use of said road, which belonged in 1813 to Robert Lamborn, is now, I understand, the lot of Henry G. White, which adjoins the meeting-house

lot on the south. · I find as a fact, subject to the competency of the proof which is hereafter discussed, that Samuel Martin, although he knew where the actual line described in the deed was, did not intend to erect a fence on the western line back of the sheds, but intended to connect the iron fence which he was building, and which, by his codicil, he directed to be constructed, with the ends of the sheds. At the same time, it is clear that Mr. Rupert did not assume to construe the will on this point, nor to pass upon the question as a disputed matter. Mr. Barnard, who represented the residuary legatees, seems to have raised the question, but no one seems to have doubted that his position was sound. It was apparently conceded by Mr. Townsend, and all who were present before the Auditor, that there was no occasion for a fence on the western line, and no question whatever was made on the subject. The draft attached to the testimony returned with Mr. Rupert's report, and the measurements and additions thereof on the same, show beyond a doubt that there was no thought by those there present of the erection of a fence on the western line. · Hiram Hall, one of the plaintiffs, was called as a witness before Mr. Rupert and testified as to the character of the fence, and seems to have been asked in regard to the cost of the same. Evan T. Swayne was an active member of the committee of the Monthly Meeting, and conferred with Mr. Townsend in regard to the same matter. Both of them must have known that the inquiry was depending. It would be difficult, after this lapse of time, either for them, or others, to recollect, or for me to properly infer, how full and precise was their knowledge of the question then being considered. Nor do I deem it important, for enough is shown to have put then on inquiry. There is no evidence to show that John Lamborn or Samuel Chandler, the other two plaintiffs, had at the time knowledge of the inquiry pending, though it would be a violent presumption to suppose that they knew nothing of it. I see nothing in the evidence, however, to justify me in supposing that any of the plaintiffs raised before Mr. Rupert the question involved before me, nor that they had actual knowledge that it was being passed upon. Indeed, I am impressed that at that time the question now raised had not occurred to them, or to any one else interested in Samuel Martin's estate.

After Mr. Rupert's report, allowing $1,350 for the erection of the iron fence, was confirmed by the court, the executors proceeded to erect the same. They have built the division fences between the three lots, and the outside fence on three sides of the meeting-house grounds. They have not, as yet, however, connected the same with the sheds, so that thirty-nine feet yet remains to be built for that purpose. All of the

$1,350 has been expended, except $33.30, which remains in their hands, with which it is their intention to connect the fence already constructed, with the ends of the sheds. Except this $33.30, they have none of the estate of Samuel Martin remaining in their hands. In the fall of 1882, the executors had built the fence where it now is, and had stopped work. The next Spring they were called upon by the committee, and required to build the fence on the west line back of the sheds. Whether they refused peremptorily, or explained the situation in which they were, is not very clear. They say they informed the committee that all the money was expended, except the little balance in their hands, and the committee say they simply refused to go on. Hiram Hall, however, admits a conversation with Solomon Mercer on this subject.

Both sides seem to me to have been rather abrupt in this matter, and to have shown little disposition toward conciliation. With a little concession, and less pride of opinion, there need have been no serious dispute on this point. Indeed, it seems to me that the case was an excellent one to have been settled at home, and that by calling in the residuary legatees, the real parties in interest, the dispute might easily have been adjusted among themselves. However, the executors, declining to build this fence out of their own moneys, the present bill was filed to compel them to build it in accordance with the views of the plaintiffs,—*hinc illae lacrymae!*

I do not care to put the decision of this case on the ground suggested by Mr. Pinkerton, that the plaintiffs are mere volunteers. It is undoubtedly true that the real party in interest is the Preparative Meeting itself, and that the plaintiffs were appointed a committee by the meeting after the rights of the meeting had fully vested. Probably it would have been better to have described the plaintiffs as suing in their own right, and on behalf of the other members of the meeting of which they are also members. Equity, however, looks rather to the substance, and we may well, under all the facts, dispose of the case, as if the amendment had been made. In my judgment the case resolves itself into three questions of law:

(1.) Is there a latent ambiguity in the codicil to Samuel Martin's will?

(2.) Has this court jurisdiction of the complaint?

(3.) Has this contention been concluded by the judgment of the Orphans' Court?

In my opinion all of these questions must be resolved against the complainants.

I recommend a decree dismissing the complaint at the cost of the complainants.

Exceptions were filed to this report by the plaintiffs. These

were dismissed, and the decree recommended by the trustee entered.

The plaintiffs thereupon took this appeal assigning for error, *inter alia*, the entering of the decree dismissing their bill.

*Wm. M. Hayes*, for the appellants.—1. There is no latent ambiguity in the codicil to Samuel Martin's will.

That verbal testimony may not be received to contradict or vary a plain direction in a will, is consonant with reason and authority.

Mr. Justice TRUNKEY, in delivering the opinion of this court in Porter's Appeal, May 17th, 1880, says: "Parol evidence to show what were the actual testamentary intentions, such as his declarations of what he had done or meant to do, is inadmissible, but it is competent to determine which of several persons or things was intended under an equivocal description." 13 Norris, 336.

"The legal construction of a will in writing cannot be explained or altered by the parol declarations of the testator, of his understanding of the meaning of the will, or of his intentions to do something else": SERGEANT, J., Comfort *v.* Mather, 2 W. & S., 453.

"Our law requires that wills should be in writing, and proved by two witnesses. But if the writing is to be contradicted by parol evidence, the object of the law will be defeated, and all certainty destroyed. . . . . . The rule of law, therefore, is that the writing is not to be altered or explained by evidence *aliunde*": TILGHMAN, C. J., Iddings *v.* Iddings, 7 S. & R., 113.

"A will which contains no intelligible devise or bequest, is void for uncertainty; parol evidence is not admissible to explain what the testator meant by such an instrument": WOODWARD, J., Kelley *v.* Kelley, 1 Casey, 460.

Parol evidence as to mistakes in a will held to be inadmissible, and elaborately discussed by READ, J., in the case of Wallize *v.* Wallize, 5 P. F. S., 242.

2. This court has jurisdiction of the matter. This question, we think, is set at rest by the case of the Fidelity Trust Company's Appeal, 11 W. N. C.. 264, where, in a case of similar character, the question was raised and the jurisdiction of a Court of Equity sustained, the court, *inter alia*, saying, "that this is a proper case for determination by a proceeding in equity is unquestioned." See, also, Swinney et al. *v.* Fidelity Insurance, Trust and Safe Deposit Company, 10 W. N. C., 290.

3. The contention has not been concluded by the decree of the Orphans' Court.

2 AMERMAN—4

It is very doubtful whether the Orphans' Court in any event, would have been the proper tribunal; and even if the Preparative Meeting, or its committee, had received notice of the audit before Mr. Rupert, and had appeared before him, it is very questionable whether he, as an Auditor appointed by the Orphans' Court, to pass upon exceptions to an account, could have assumed jurisdiction of this fence question.

The complainants here are neither creditors, legatees, nor distributees, and only such classes of persons can make claim in a proceeding for distribution in the Orphans' Court: Braman's Appeal, 8 Norris, 78; McBride's Appeal, 22 P. F. S., 480.

The Orphans' Court does not have general equity powers.

"It cannot entertain a bill of discovery": Brinker *v.* Brinker, 7 Barr, 55.

"Waste is not a subject matter of inquiry of which the Orphans' Court can take cognizance: Crowell's Appeal, 2 Watts, 295.

"The Orphans' Court has not general equity jurisdiction, and under equity rules is not enabled, when once possessed of a cause, to make an end of the controversy": Ake & Feay's Appeal, 24 P. F. S., 116.

The language of Mr. Justice TRUNKEY, in Fidelity Trust Company's Appeal, is exceedingly applicable to this case: "That this is a proper case for determination by a proceeding in equity is unquestioned. The bill is not to compel the distribution of the testator's estate, but to establish the right of the" Kennett Square Preparative Meeting under the codicil to the will. "This right being established, the decree" ought to accord "with the provisions of the" codicil. "Its enforcement will be governed by similar principles as are prescribed in the statute providing for the recovery of legacies in the common law courts."

*John J. Pinkerton,* for appellees.—Will the Court of Common Pleas assume jurisdiction in this case?

It can scarcely be doubted that the provision in the codicil of Samuel Martin's will for the erection of a fence is a legacy to the Friends' Meeting at Kennett Square. If this is so the Orphans' Court had full and complete jurisdiction of the question of its cost and erection.

This court has said:—

It is very clear that the Orphans' Court in a proceeding to distribute an estate among legatees, next of kin and heirs, has ample power to inquire into and determine all questions standing directly in the way of distribution to these parties: Dundas's Estate, 23 Smith, 480.

Within its appointed orbit the jurisdiction of the Orphans' Court is exclusive, and therefore necessarily as extensive as the demands of justice: Shollenberger's Appeal, 9 Harris, 341.

If there is anything besides death which is not to be doubted, it is that the Orphans' Court alone has authority to ascertain the amount of a decedent's property and order its distribution among those entitled to it: Whiteside *v.* Whiteside, 8 Harris, 474; Ashford *v.* Ewing, 1 Casey, 213; Kellera's Estate, 5 Harris, 422; Dundas's Estate, 23 P. F. S., 474; Hammett's Appeal, 2 Norris, 392; Head *v.* Meloney, 17 W. N. C., 88.

Mr. Justice CLARK delivered the opinion of the court April 19th, 1886.

This bill was filed by Hiram Hall *et al.*, in behalf of the Kennett Square Preparative Meeting of Friends, against Solomon and Sharpless Mercer, executors of the last will and testament of Samuel Martin, deceased, to establish an alleged right under the said will, and to compel the performance, by said executors, of certain duties incident to that right. Samuel Martin, for fifty years and upwards, prior to his decease, had been a member of the Preparative Meeting at Kennett Square; he died on the 17th June, 1880, at an advanced age, possessed of an estate estimated to exceed $70,000, and leaving to survive him collateral kindred only. In a codicil to his will, dated 8th March, 1880, he provided as follows:—"I, Samuel Martin, of Kennett Square borough, have for a considerable time desired, and it is my wish, that my executors named in my last will and testament shall, at a proper time within one year after my death, enclose, with a good and substantial iron fence (somewhat like the one around the cemetery at Unionville), the Friends' meeting-house grounds, as also the school-house grounds attached, and the Friends' burial ground, all expenses incurred to be paid from the proceeds of my estate."

After the decease of the testator his will was probated, and letters testamentary thereon were issued to the defendants. He began the work of erecting this fence himself; fearing, perhaps, that he might not be able in his lifetime to finish it, he added the codicil to his will which had been previously executed, in order that, in the event of his death, it might be afterwards completed. The meeting-house and burial grounds referred to were, as the Master has found, at the time under the control and beneficial ownership of the Kennett Square Preparative Meeting of Friends, whilst the school grounds were devised in the testator's will to the Kennett Monthly Meeting. Both of these religious bodies are unincorporated; the Monthly Meeting is an ecclesiastical organization, of superior authority, embracing within its jurisdiction and bounds

the Kennett Square, the Kennett, and the Marlborough Preparative Meetings, and convenes alternately at the meeting houses of the subordinate bodies named. The three lots adjoin, each the others; the meeting-house and the school ground fronting on what is known as State Street, in Kennett Square, and the burial ground lying in the rear of the others.

The amount expended by Martin in his lifetime, on the fence, was $444.60; this sum, after Martin's death, was paid by the executors, and for that expenditure they have credit in their account. A contest or controversy soon commenced as to the erection of this fence; indeed, the codicil, for some reason not shown, was not probated until a citation to that end had been served. The residuary legatees seem to have favored an economic administration of this provision of the will, and questions were raised (1) as to the bill for fencing already done, (2) as to whether the fence should enclose each of the three lots separately, or the whole three as one merely, and (3) as to the amount of money necessary to be expended in the work.

On the 7th July, 1881, the executors filed their first account; claiming credit for $444.60, the amount disbursed by them in payment of the debt incurred for the fence by the testator in his lifetime, and for $1,600, which they claimed to retain or reserve to complete the work, and exhibiting a balance in their hands for distribution to the residuary legatees of $31,306.29. To both of these items of credit, exceptions were filed by the residuary legatees, and an Auditor was appointed to pass upon these matters of dispute. The Auditor allowed the item of $444.60, reduced the $1,600 item to $1,350, and in this form the account was subsequently confirmed. On 29th June, 1882, a supplemental account was filed, showing a balance of $348.60 in the hands of the executors, which was confirmed without objection.

The duty of the executors, under the codicil to this will, was to enclose "the Friends' meeting-house grounds," as also "the school-house grounds attached," and the "Friends' burial ground." The three different lots are severally designated, and the duty imposed clearly attached to each of them separately, the character and quality of the fence was not only particularly specified, but the testator in his lifetime, by the partial erection of the work, indicated the kind of a fence he intended. The several and respective lots were to be enclosed —that is to say, shut in on all sides. A field with a fence on three sides only could not, in any proper sense, be spoken of as inclosed, unless the fourth side was bounded by some natural object, or occupied by some artificial erection, which rendered a fence impracticable or unnecessary. In this case it is

conceded that the sheds do not extend to the eastern boundary of the meeting-house lot—indeed, the sheds do not appear to have been located with reference either to the line of the lot or of the alleged right of way. The reservation for the right of way is of twenty feet along the Taylor line, whilst the sheds are twenty-seven feet distant from that line at the north, and forty-two and a half feet at the south end; a considerable part of the lot therefore lies west of the sheds. Whether this "privilege of a road twenty feet wide," reserved nearly three quarters of a century ago, and never yet exercised, will hereafter be asserted, is a matter to be determined in the future; but if it should, the exercise of it is in no way inconsistent with the enclosure of the grounds; a proper arrangement for the enjoyment of the privilege may be provided when the privilege is to be exercised. Bringing the words of the will and codicil into contact with all the surrounding facts and circumstances, no doubt can reasonably arise as to their correct application to the subject matter; no latent ambiguity can, therefore, be said to exist. The very learned and elaborate report of the Master contains a reference to a large number of cases, the authority of which is undoubted, but they have no application whatever to this case. The testator's provision for the erection of this fence is plain, and the duty which it imposed upon the executors clear and obvious. If that duty had been discharged, as directed, the embarrassment which they now suffer would have been wholly avoided.

It is contended, however, that the complainants are concluded by the decree of the Orphans' Court confirming the report of the Auditor appointed to pass upon the exceptions to the executors' account. We do not think so. The executors as the accountants, and the residuary legatees as the exceptants, were the only parties to that contention. No question affecting the complainants' rights, or of distribution, was raised; the complainants had no concern whatever in the result. If the executors had discharged their duty, as they were plainly directed, the costs of the erection of the fence would then have been accurately ascertained, by the amount of the actual expenditure. If the executors chose to estimate the amount required, and accept a credit for a sum retained for the purpose, that was a matter of no moment to the complainants, who, if the grounds were fenced, were indifferent as to the cost. But we do not regard the action of the Auditor in this respect as conclusive upon any one. The item $1,350 was but an estimate, and that sum was simply allowed to be retained for this special purpose. If the fence had been erected at a cost of $1,000, can it be doubted that the remaining $350 would have belonged to the estate? And if the $1,350

[Appeal of Hall.]

proved to be inadequate, could not the accountants apply from the funds of the estate such additional amount as would complete the work according to the plan of the testator?

The Orphans' Court never assumed jurisdiction of the precise subject matter of this suit. The complainants have never been parties to any proceeding there; if they had appeared at the hearing of the exceptions, they could not have raised the question there which we are now considering here. In the confirmation of the executor's account, a sum of money was set apart, and retained by the executors, for the performance of a specific provision of the codicil to the will; but the precise import and meaning of that provision is now disputed, and the responsibility of the executors as to a specific portion of the work is denied. If the sum thus set apart had been for the payment of legacies, would a legatee, whose right to participate was subsequently denied, be thereby precluded from proceeding in the Common Pleas for the establishment of his right? Or, if the sum thus set apart and retained had been for the payment of a single specific legacy, part of which, by reason of an alleged advancement, was in dispute, would the legatee be deprived of his remedy in the Common Pleas, by the decree of the Orphans' Court, in a proceeding to which, in the very nature of the case, he could not be a party, and in which his claim could not be adjudicated? The mere statement of such a proposition is a sufficient argument to show that it is altogether unsound.

As to the power of the Common Pleas, in equity, to take cognizance of this case, there can be no doubt. This bill is brought to establish a right of the Kennett Square Preparative Meeting of Friends, under the codicil of Samuel Martin's will; that right, as to the fence along the western boundary, has been positively denied, and this is a suit in which the claim of the complainants is to be adjudicated. There is no averment of a deficiency of assets, and the whole question is one of the complainants' right to recover. The jurisdiction of the Common Pleas, in this form, to establish a right under a will is fully considered in the Fidelity Insurance Co.'s Appeal, 3 Outerbridge, 443. In that case a bill was filed by the members of a church organization against the executors of Charles Macalester, deceased, to enforce their rights under the will in reference to the erection of a church which the testator, in his will, had directed to be built out of the funds of his estate, and it was held that the jurisdiction of the Orphans' Court was not exclusive, but that the Common Pleas had jurisdiction in the premises. Our brother TRUNKEY, delivering the opinion of this court, says: "The Orphans' Court is a special tribunal for specific cases; it is not vested with the general powers of

a court of equity.　It has exclusive jurisdiction to ascertain the amount of the estates of decedents and order their distribution among those entitled, whether creditors, legatees or distributees. But the remedy of the creditor to establish his debt in a common law court is not taken away :　Hammett's Appeal, 83 Pa. St., 392.　And in some circumstances he may have execution upon his judgment.　Legatees are authorized by the Act of February 24th, 1834, to proceed by action in a common law court to recover a bequest of money or other goods or chattels when the executor has assets, without interference with the exclusive jurisdiction of the Orphans' Court in the settlement and distribution of the estates of decedents :　Burt v. Herron's Ex'rs, 66 Pa. St., 400.　The collection of judgments in favor of creditors or legatees may be stayed for a proper time to await settlements or other proceeding in the Orphans' Court. After a legatee has obtained judgment the executor may aver the want of assets, and thereupon execution shall be stayed until an account shall be taken in the proper tribunal, and the amount, if any, payable on such legacy, be ascertained." When the right has been established, the decree must accord with the provisions of the codicil to the will, and its enforcement must of course in all respects be governed by principles similar to those which are applicable in the recovery of legacies in common law courts.

The decree of the Common Pleas is therefore reversed, and it is now ordered, adjudged and decreed that the plaintiffs are in equity entitled, as set forth in the bill; and it is further ordered that Solomon Mercer and Sharpless Mercer, executors of the last will and testament of Samuel Martin, deceased, the defendants, do forthwith proceed, according to the provisions of the codicil to the last will and testament aforesaid, to erect a good and substantial iron fence along the western boundary of the grounds of the Kennett Square Preparative Meeting of Friends, in Kennett Square, Chester county, and to extend the fences, already erected, along the northern and southern lines of the said grounds respectively, to connect therewith; that the said grounds may be inclosed; the said fence to be, in all respects, similar to the fences already erected, as aforesaid ; and it is ordered that the defendants pay the costs.